# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA       :

        **v.**               :          **CRIMINAL NO. 11-577**

VINCENT JOSEPH DEMSKY      :

## GOVERNMENT'S SENTENCING MEMORANDUM

After his arrest for attempting to illegally purchase prescription medication while at work on the Boeing Company's Ridley Park, PA campus, the defendant, Vincent Joseph Demsky, twice violated his conditions of release – once by illegally using PCP and the second time by illegally carrying around prescription medications without a prescription.  He also lied about his conduct to the Court at the violation hearing.  The defendant has two prior drug convictions and four prior convictions in total which, although old, resulted in jail time or ARD and should have served as a warning of the serious consequences of criminal conduct.  And now the defendant stands before this Court arguing that his illegal conduct in this matter was the result of "coercion and duress" caused by the government.[1]  It is the government's view that these statements reflect a lack of acceptance of responsibility by the defendant for his criminal conduct and, given the defendant's past and recent history of illegal conduct, support the imposition of a custodial sentence in this case.  Moreover, in the government's view, the defendant's abuse of his responsibilities as a Boeing worker contributed not only to the

---

[1]     In the PSR, the Probation Office does not lay out the full extent of the defendant's objection, in which the defendant seeks a downward variance because of his opioid addiction and claims that the government was "excessive in the creation of the crime" and that the government's conduct comprised significant Government coercion to induce the commission of the crime, particularly in view of the Defendant's opiate addiction as a result of his medical problems."  As will be discussed further in this memorandum, a review of the sale between the defendant and the government cooperator that forms the basis of the instant charges shows that there wasn't the slightest coercion or duress by the government and such a claim by the defendant is both outrageous and offensive.

widespread acceptability of an illegal drug culture at Boeing, but significantly increased the likelihood of danger to the military end users of the aircraft manufactured at Boeing. Accordingly, the government respectfully requests that the Court impose a sentence at or near the top of the sentencing guideline range, after correctly calculating that range to exclude any credit for acceptance of responsibility.

## I.      BACKGROUND

On March 26, 2011, the defendant pled guilty to Count One of the information charging him with attempted possession of oxycodone, in violation of Title 21, United States Code, Section 846.  The charges stem from his attempt on September 22, 2011, to illegally purchase two placebo Oxycontin 80mg tablets from an individual cooperating with the government inside of a building on The Boeing Company's Ridley Park campus.

## II.     SENTENCING CALCULATION

### a.      Statutory Maximum Sentence

According to the Probation Office, the Court may impose a sentence of one year imprisonment, a year of supervised release, a $100,000 fine, and a $25 special assessment.[2]

### B.      Sentencing Guidelines Calculation

The government respectfully requests that the Probation Office's calculation of the defendant's advisory guideline range be modified as follows:

---

[2]      The potential fine of $100,000 per count of conviction is different from the fine that the parties understood could be imposed at the time of the defendant's change of plea hearing – it was the parties understanding that the maximum fine that could be imposed was $1,000 for the count of conviction.  The special assessment is also different in that it is $25 instead of $100.

Base offense level based on attempted possession of controlled substances, 21 U.S.C. § 844, under U.S.S.G. § 2D2.1:                                           **8**

Adjustment for acceptance of responsibility, under U.S.S.G. § 3E1.1(a)[3]    **0**

---

**TOTAL OFFENSE LEVEL**                                                                                **8**

The defendant has a Criminal History Category of **I** because his three prior convictions[4] occurred

more than 10 years ago.  Accordingly, with a total offense level of 8 and a criminal history

category of I, his guidelines range is **zero to six months imprisonment**.

---

[3]       The defendant pled "open" to the charges against him and therefore the parties did not have any agreement as to whether the defendant was entitled to a two-level reduction to his offense level for acceptance of responsibility under U.S.S.G. § 3E1.1(a).  The Probation Office recommends that the Court grant the two-level reduction; the government respectfully objects to this recommendation.

[4]       On June 24, 1980, the defendant was found by a Judge of the City of Wildwood Municipal Court to have violated New Jersey Statute 2A:170-77.5, and was sentenced to six days in county jail.  Since the time of the defendant's conviction, New Jersey Statute 2A:170-77.5 has been repealed.  Nevertheless, historical and statutory notes related to this statute indicate that the statute "related to the sale or distribution without prescription recording and filing of prescriptions, and prohibition of the control or possession without a prescription of hypodermic syringes or needles."  Westlaw, N.J.S.A. 2A:170-77.5.

On December 20, 1982, the defendant pled guilty to simple assault and criminal mischief and was sentenced to two years probation (note, the PSR paragraph 32 lists the sentence as two years "imprisonment," which does not conform to the court records for that conviction).  According to the court records for the conviction, the original charges against the defendant included Aggravated Assault and Resisting Arrest.

On December 20, 1982, the defendant was placed on ARD for crimes involving theft by unlawful taking or disposition, possession of instruments of crime, and criminal mischief.

Thereafter, on December 16, 1985, the defendant pled guilty before a Judge of the New Jersey Superior Court, Cape May County to possession with intent to distribute CDS (controlled dangerous substances), in violation of New Jersey Statute 24:21-19A(1), and was sentenced to two years probation with the specific condition that he serve 60 days in county prison with credit for one day served and the balance suspended.

**III.    THE DEFENDANT HAS NOT ACCEPTED RESPONSIBILITY NOR IS HE
ENTITLED TO A DOWNWARD DEPARTURE PURSUANT TO U.S.S.G. §
5K2.12 OF THE GUIDELINES**

Although the defendant pled guilty to the charged offense, he has not

demonstrated acceptance of responsibility for his crime and should not receive a two-level

downward adjustment to his offense level pursuant to U.S.S.G. § 3E1.1(a).  His lack of

acceptance is reflected in both his continued criminal conduct after his guilty plea, and in his

claim of government coercion and duress.  Furthermore, the defendant's claim to a downward

departure pursuant to U.S.S.G. 5K2.12 (coercion and duress) is not remotely warranted under the

circumstances of this case.

The Sentencing Guidelines direct that "[i]f the defendant <u>clearly</u> demonstrates

acceptance of responsibility for his offense, decrease the offense level by 2 levels."  U.S.S.G.§

3E1.1(a) (emphasis added).  A defendant who seeks an offense level reduction under the

Sentencing Guidelines must prove, by a preponderance of the evidence, that he is entitled to that

reduction.  <u>United States v. Muhammad</u>, 146 F.3d 161, 167 (3d Cir. 1998).  The reduction for

acceptance of responsibility is no exception to this rule.  <u>Id.</u>  Even when a defendant has pled

guilty, there is no presumption that he should receive an acceptance of responsibility reduction.

Pleading guilty may be "significant evidence" of acceptance of responsibility, but it does not

establish that a defendant is entitled to a reduction as "a matter of right," U.S.S.G. § 3E1.1 app.

note 3, nor does it shift the burden to the government to disprove acceptance.  "There is no set

formula for making th[e] determination" of whether the defendant has met his burden.  <u>United</u>

<u>States v. McDowell</u>, 888 F.2d 285, 293 n.2 (3d Cir. 1989).  The sentencing court "has the

obligation to assess the totality of the situation in determining whether the defendant accepted

responsibility." <u>United States v. Cohen</u>, 171 F.3d 796, 806 (3d Cir. 1999), quoting <u>McDowell</u>,

888 F.2d at 293 n.2.  The district court's determination of whether the defendant has met his burden will only be reversed if the reviewing court is "left with a definite and firm conviction that a mistake has been committed."  United States v. Lessner, 498 F.3d 185, 199 (3d Cir. 2007).

In this case, it is undisputed that the defendant attempted to illegally purchase prescription medication while at work at the Boeing Company.  This Court has also found that after the defendant pled guilty in this case, he twice violated his conditions of release by using PCP and by possessing prescription drugs not prescribed to him, both of which are crimes.[5]

As one of the non-exclusive factors bearing on acceptance of responsibility, the Sentencing Guidelines include a defendant's "voluntary termination or withdrawal from criminal conduct or associations."   U.S.S.G. § 3E1.1 app. note 1(b).  It is well established that in making the acceptance of responsibility determination, a district court may consider the defendant's subsequent conduct, including criminal misconduct.  United States v. Ceccarani, 98 F.3d 126, 130 (3d Cir. 1996).  In Ceccarani, the Third Circuit noted that "the defendant's post-offense conduct can shed significant light on the genuineness of a defendant's claimed remorse."  Id. at 129.  Similarly, the commentary to the Sentencing Guidelines states that the "evidence of acceptance of responsibility" provided by a guilty plea "may be outweighed by conduct of the defendant that is inconsistent with acceptance of responsibility."  U.S.S.G. § 3E1.1 app. note 3; see also Puckett v. United States, 556 U.S. 129, 143 (2009) ("Given that [the defendant] obviously did not cease his life of crime, receipt of a sentencing reduction for acceptance of responsibility would have been so ludicrous as itself to compromise the public reputation of

---

[5]     In paragraphs 5, 6 and 51 of the PSR, the Probation Office reports information purportedly obtained from Pretrial Services. There are several errors in these paragraphs that the government respectfully requests be corrected at the sentencing hearing.  For example, nowhere is it mentioned that this Court found the defendant to have twice violated his conditions of release, and paragraphs 6 and 51 imply that the defendant's use of PCP stemmed from the defendant's "legitimate use of a prescription for Xanax," which it clearly did not.

judicial proceedings.") (emphasis in original).  The defendant's claims of coercion and duress, discussed further below, also belie any claim of acceptance of responsibility.

This Court should deny the defendant's request for a downward departure pursuant to U.S.S.G. § 5K2.12 for coercion and duress because it is not warranted under the facts of this case.  Section 5K2.12 provides:

> If the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may depart downward.  The extent of the decrease ordinarily should depend on the reasonableness of the defendant's actions, on the proportionality of the defendant's actions to the seriousness of coercion, blackmail, or duress involved, and on the extent to which the conduct would have been less harmful under the circumstances as the defendant believed them to be.  Ordinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency. Notwithstanding this policy statement, personal financial difficulties and economic pressures upon a trade or business do not warrant a downward departure.

Although this Court has broad discretion in determining whether to grant a defendant's departure motion, the government respectfully argues that a departure under this provision should be denied.  Not only was there nothing akin to a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency" here, but a review of the transcript of the transaction with the defendant makes clear that far from coercion and duress, the defendant freely and independently accepted the government cooperator's offer of sale:

CS: . . . .    Yeah.  Yo, I got some 40's and 80's man.

Defendant:    I just went to the doctor.  I got 40's.

CS:    Ah, OK.

Defendant:    What do you get for the 80's?

CS:    $40.

Defendant:     Yeah, I get 'em.

CS:            There the old one's.

Defendant:     Oh yeah.  Really.  You're kiddin' me?

CS:            Yeah. Yeah.  *--UI--*  We'll go somewhere.  We ah, we'll go somewhere.

Defendant:     You sure?

CS:            Yeah

Defendant:     Where the f--- did you get them at?

CS:            Went up in Philly man.  I got pops too.  There 1200.  Yeah.

Defendant:     I remember we used to walk around.  That f---in' idiot stuck one on the wall back there.  What a f---in' jerkoff.  This is when I came over here. You take it when you go out and smoke.

CS:            I haven't seen him in years man.  I used to hook up with that guy.

Defendant:     They can f---in' take that number go back to the pharmacy and f--in' get goofy.  They f---in' prescribed that to him.  And f---in' some  mother took the wrapper off one and f--in' stuck it to the wall outside when you're walking on over.

CS:            No way.

Defendant:     This is when I started over here four years ago.

CS:            Alright.  Yeah.  Yeah.  Because they ain't been around awhile.

Defendant:     But ah.  There's a serial number on it. These f---in' things.  And they can go right back to you and whoever f--in' ever prescribed it.  Yeah.  I wouldn't mind f--in getting' some of those bad boys.  As a matter of fact, I want two of them.  Let's go over to the refrigerator right there inside that cabinet.

CS:            Where at?

Defendant:     Inside my refrigerator next to my cabinet there.  Ain't… Ain't nobody looking, right?

CS:            Ah no, not now.  I gotta pull 'em out.  Huh.

| Defendant: | I'll put the $80 bucks right here. |
| CS: | Huh? |
| Defendant: | I'll put the $80 dollars right here. . . . . |

As the Court will remember, at the violation hearing the defendant attempted to deny any substance abuse issues and had turned down Pretrial Services's assistance in getting the defendant treatment. Clearly, despite his denials, the defendant has substance abuse issues and those issues should be considered by the Court when determining the appropriate sentence for the defendant. However, for the defendant to claim that he was coerced into purchasing from the CS, in the government's view, is not only outrageous, but reflects a obvious failure on the part of the defendant to accept responsibility for the crime he committed.

## IV.     DISCUSSION OF THE SENTENCING FACTORS

Once the Court has properly calculated the guideline range, the Court must next consider all of the sentencing considerations in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. §

3553(a).[6]  In this case, the government believes that a sentence at or near the top of the sentencing guideline range is warranted.

### A.   Nature and Circumstances of the Offense and History and Characteristics of the Defendant.

#### I.   Oxycodone

"Oxycodone is a semisynthetic opiate manufactured by modifying the chemical thebaine, an organic chemical found in opium.[7] It is the active ingredient in a number of commonly prescribed pain relief medications, including Percocet and OxyContin, that come in a variety of dose strengths.[8] The "[i]ntended use of OxyContin is for long-term relief (up to 12 hours) of moderate to severe pain associated with conditions such as cancer and arthritis."[9] Currently all of the products containing oxycodone are classified by the Drug Enforcement Administration as Schedule II controlled substances.[10]

Oxycodone's chemical structure is similar to codeine and is almost a potent as morphine in its ability to produce opiate-like effects, including euphoria.[11] It works through the

---

[6] Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the 'not greater than necessary' language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'" United States v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006) (quoting United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006)).

[7] http://www.cesar.umd.edu.cesar/drugs/oxycodone.asp

[8] Id.

[9] Id.

[10] Id.

[11] Id.; http://www.teenoverthecounter drugabuse.com/oxycodone.html.

central nervous system by altering the user's sense of pain and his or her emotional response to pain, but like other narcotic medications, can impair certain daily activities, including driving and other mental and physical abilities.[12] These side effects – including breathing irregularity or respiratory depression; increased pressure of cerebral and spinal fluid; headaches; nausea; dizziness; seizures; heart failure; and low blood pressure  -- are usually mild, but there are more serious complications and negative effects from using products containing oxycodone, particularly when abused.[13]

When oxycodone products are used consistent with a doctor's care, signs of addiction can be monitored and controlled more effectively than when used outside of a doctor's care.[14]  Accordingly, "when used illicitly, the chances of becoming addicted to it increase exponentially."[15] In part, this is caused by the fact that oxycodone has "many similarities to other drugs of abuse including alcohol, heroin, and marijuana, in that they elevate levels of dopamine, the neurotransmitter linked with pleasure experiences. As a result, prolonged use and abuse of oxycodone medications eventually changes the brain in such a way that a user cannot quit on his or her own, a typical sign of addiction."[16] "Drugs that cause similar effects to oxycodone include: opium, codeine, heroin, methadone, hydrocodone, fentanyl, and morphine."[17] The potential for withdrawal symptoms when using prescription opioids (e.g., oxycodone) is

---

[12] http://www.cesar.umd.edu.cesar/drugs/oxycodone.asp

[13] Id.

[14] Id.

[15] Id.

[16] Id.

[17] http://www.justice.gov/dea/pubs/abuse/drug_data_sheets/Oxycodone.pdf

extremely high, especially when the user stops suddenly, and may include severe symptoms such as anxiety, nausea, insomnia, muscle pain, fevers, and other flu like symptoms.[18]

## II.    Prescription Drug Abuse is a Rampant National and Local Problem

Prescription drug abuse – despite (or maybe because of) popular misconceptions – is more wide-spread, more destructive, and more dangerous than even street-level drug abuse. Nearly seven million Americans are hooked on prescription drugs, more than are addicted to cocaine, heroin, hallucinogens, ecstasy, and inhalants – combined.[19]  Prescription drugs hook the poor and the rich, the old and the young, the black and the white.[20]  It is an epidemic.[21]  Just like street drugs, prescription drugs are dealt, hand-to-hand, just like baggies of heroin or vials of crack.[22]  And just like street drugs, prescription drug abuse produces the same problems: "addiction, crime and broken families."[23]

In recent years, courts around the country have begun to recognize the same. See, e.g., United States v. Marty, 450 F.3d 687, 690 n.4 (7th Cir. 2006) ("the danger that arises from

---

[18] Id.

[19] Prescription Drug Abuse Ravages Youth, MSNBC, July 6, 2009, available at http://www.nbcphiladelphia.com/news/health/Prescription_drug_abuse_ravages_state_s_youth.html.

[20] See also Kimberly Kindy, A Tangled Story of Addiction, Washington Post, Sept. 12, 2008, at A01, available at http://www.washingtonpost.com/wp-dyn/content/story/2008/09/11/ ST2008091103947.html (describing Cindy McCain's addiction to Percocet, and her doctor who supplied her with the drugs lost his license).

[21] Prescription Drug Abuse Called "Epidemic", UPI, July 8, 2005, available at http://www.upi.com/Science_News/2005/07/08/Prescription_drug_abuse_called_epidemic/UPI-13411120831997/; National Drug Intelligence Center, National Drug Threat Assessment 2005, U.S. Department of Justice, Document ID: 2005-Q0317-003, February 2005 at 99.

[22] Good Medicine Meets Bad Behavior, CNN, available at http://www.cnn.com/ 2006/HEALTH/05/16/cnna.passierb/index.html.

[23] Michael Janofsky, Drug-Fighters Turn to Rising Tide of Prescription Abuse, N.Y. Times, March 18, 2004, at A24.

the sale, misuse, and abuse of OxyContin is not excused by its status as a prescription painkiller.

While Marty may have obtained her pills from a pharmacy, rather than a drug dealer, her crime

still poses a grave danger to the community."). In United States v. Purdue Frederick Co., Inc., a

court noted:

> Prescription drug abuse is rampant in all areas of our country . . . causing untold
> misery and harm. The White House drug policy office estimates that such abuse
> rose seventeen percent from 2001 to 2005. That office reports that currently there
> are more new abusers of prescription drugs than new users of any illicit drugs. As
> recently reported, "Young people mistakenly believe prescription drugs are safer
> than street drugs . . . but accidental prescription drug deaths are rising and
> students who abuse pills are more likely to drive fast, binge-drink and engage in
> other dangerous behaviors."

495 F.Supp.2d 569, 576 (W.D. Va. 2007); see also McCaulley v. Purdue Pharma, L.P., 2002 WL

398715, at *1 (W.D. Va. 2002) (not precedential) (referring to the "national problem of

prescription drug abuse").

In the Eastern District of Pennsylvania, prescription drug abuse is quite

significant as well.[24]  Local clinics have stated that "drug addiction in both Philadelphia and New

Jersey is almost legendary due to its severity.  Heroin and opioid-based prescription medication

are two the top drugs abused in these areas.  More than four percent of those surveyed in both the

Philadelphia area and in New Jersey reported using pain relievers for nonmedical purposes in the

past year . . . The rural areas of Pennsylvania, too, are increasingly becoming a target of drug

dealers."[25]  State legislators in Pennsylvania have been trying to address this growing problem.[26]

---

[24] National Drug Intelligence Center, Philadelphia/Camden High Intensity Drug Trafficking Area
Drug Market Analysis, June 2007, available at
http://www.justice.gov/ndic/pubs23/23921/abuse.htm.

[25] See http://www.meditoxofpalmbeach.com/philadelphia-new-jersey-opiate-detox.html.

[26] Rafferty Bill Would Crack Down On Prescription Drug Abuse, Fraud, Senate Republican
Communications, May 3, 2004, available at http://www.pasenategop.com/news/
archived/2004/0504/rafferty-050304-prescrip.htm ("Rafferty noted that prescription drug fraud
and abuse are becoming a serious problem in Pennsylvania and other states, and stricter

Part of the reason that prescription drug abuse is so rampant is because they come with the imprimatur of legitimacy: Doctors hand them out; it is not per se illegal to have them. There is very low social disapproval.[27]  The general public – which the Court takes into consideration at the time of sentencing when considering the nature of the defendant's conduct – is grossly misinformed about the danger of prescription drug abuse.  According to a recent poll:

- 40 percent say prescription pills are "much safer" than illegal drugs.

- 31 percent say there is "nothing wrong" with prescription drug use.

- 29 percent think prescription painkillers are non-addictive.[28]

In fact, prescription drugs contain opioids that are just as dangerous as those contained in cocaine and heroin.[29]  This low social disapproval is partly responsible for encouraging continued prescription drug abuse, especially among the young.[30]

---

guidelines need to be in place to combat the problem. He said prescription drug abuse accounts for approximately one-third of all drug abuse in the United States.").

[27] See Jason Szep, Grappling With Prescription Drug Addiction, Reuters, July 30, 2008, available at http://features.us.reuters.com/wellbeing/news/S3020463.html.

[28] Good Medicine Meets Bad Behavior, CNN, available at http://www.cnn.com/2006/HEALTH/05/16/cnna.passierb/index.html.

[29] Will Dunham, Study Sees Prescription Drug Abuse at US Colleges, Reuters, Mar. 3, 2008, available at http://www.reuters.com/article/latestCrisis/idUSN03357573.

[30] White House Press Release, Jan. 24, 2008, available at http://www.whitehousedrugpolicy.gov/news/press08/012408.html; see also Prescription Abuse Outstrips Illegal Drug Use, UN Warns, The Guardian, Mar. 1, 2007, available at http://www.guardian.co.uk/society/2007/mar/01/ drugsandalcohol.drugs.

In short, the prescription drug problem continues to grow because our society keeps underestimating its seriousness.[31]  It is a "significant threat" in the United States.[32] Combating prescription drugs drains law enforcement resources because "[d]rug diversion investigations can be complex and take many months."[33]  The investigation here took four years and a large amount of resources – the federal government simply does not have the resources to investigate every individual user at The Boeing Company's Ridley Park facility or to conduct similar investigations at every facility that manufactures sensitive equipment or vehicles.

### III.    Prescription Drug Abuse by Workers at The Boeing Campus's Ridley Park Facility Poses a Specific and Significant Threat to Society

The defendant in this and the 36 other cases arising out of the purchase and sale of prescription drugs at The Boeing Company's Ridley Park facility is a skilled worker whose employment at The Boeing Company provided him with the opportunity to be in the upper echelon of salary earners in the country: Internal Revenue Service's 2010 database indicates that the top 10% of Americans earn $113,799 per year; the top 25% earn $67,280 per year; and the top 50% earn $33,048.[34]  Here, the defendant reports that his salary at the time of his arrest was almost $50,000 after withholdings, which puts him in the half of American earners.  And unlike junkies and drug dealers on the street, the defendant had options.  The Boeing Company's

---

[31] See, e.g., Fredrick Kunkle, Attorney General Targets Prescription Drug Abuse, Washington Post, Oct. 6, 2005, at T03, available at http://www.washingtonpost.com/ wp-dyn/content/article/2005/10/05/AR2005100500007.html (state attorney general noting that "abuse of prescription drugs has gone unnoticed").

[32] National Drug Intelligence Center, National Drug Threat Assessment 2005, U.S. Department of Justice, Document ID: 2005-Q0317-003, February 2005 at 99.

[33] Tim Reiterman, Prescriptions Supplanting Illegal Substances as Drugs of Choice, L.A. Times, May 18, 2008, available at http://www.latimes.com/news/ custom/scimedemail/la-me-drugs18-2008may18,0,6739996.story.

[34] http://www.financialsamurai.com/2011/04/12/how-much-money-do-the-top-income-earners-make-percent/

medical coverage includes drug treatment and counseling, and the company's Employee Assistance program offered them confidential access to drug counselors and inpatient and outpatient drug treatment.

Furthermore, what must be considered in determining the appropriate sentence for this defendant is not just the salary, medical benefits and treatment options that the defendant was offered by virtue of his employment, but also the extremely sensitive nature of his work – work he performed while using and abusing opioids.

The Boeing Company Ridley Park facility produces portions of the V-22 Osprey. The V-22 Osprey is the first aircraft designed from the ground up to meet the needs of the Defense Department's four U.S. armed services: it "can transport 24 combat troops, 20,000 pounds of internal or up to 15,000 pounds of external cargo using its medium lift and vertical takeoff and landing capabilities; meets U.S. Navy requirements for combat search and rescue, fleet logistics support, and special warfare support; matches the U.S. Special Operations Command's requirement for a high-speed, long-range, vertical lift aircraft; can be stored aboard an aircraft carrier or assault ship because the rotors can fold and the wings rotate; [and] has air-to-air refueling capability, the cornerstone of the ability to self-deploy."[35] As a result, "more than 165 Osprey tiltrotors are currently in operation across 10 Marine Corps and two Air Force Special Operations Command Osprey squadrons. The two services have together logged 16 successful combat, humanitarian, ship-based or Special Operations deployments since 2007. The worldwide Osprey fleet has amassed more than 135,000 flight hours, with nearly half of those hours logged in the past two years."[36]

---

[35] http://www.boeing.com/rotorcraft/military/v22/

[36] http://www.boeing.com/rotorcraft/military/v22/docs/V-22_overview.pdf

The government understands that the defendant worked on the production of the V-22 Osprey as a Composite Fabricator.  The consequences of any undetected errors made by this defendant during his work cannot be understated.  Any errors that affected the performance of completed V-22 Osprey could prove disastrous, as experience has shown.  For example, in May 2011, the Australian Army grounded its fleet of Chinook helicopters, which are also manufactured at Boeing's Ridley Park facility, after one of the large troop-carrying aircraft crashed in Afghanistan, killing an army pilot.[37]  There is no indication that the cause of the crash had anything to do with substance abuse by employees at Boeing's Ridley Park facility, but the story is illustrative of the exponential effect that a problem with a single Chinook or V-22 Osprey could have on military operations: possible injury or death to the crew using the particular aircraft plus complete grounding of the entire fleet. In fact, the United States military has also grounded its Chinook and V-22 Osprey fleets when accidents have happened.  For example, the United States Army grounded its 466 Chinook' troop helicopters in August 1999 and advised other militaries to halt flights worldwide after a crack was found in an engine gear of a British Chinook helicopter; the United States Marine Corps grounded its fleet of V-22 Osprey in February 2007 after discovering a glitch in a computer chip that could cause the aircraft to lose control; and grounded its fleet of V-22 Osprey in 2000 after two fatal crashes that killed 23 Marines.[38]

---

[37] http://www.theaustralian.com.au/national-affairs/defence/chinook-fleet-grounded-as-fatal-afghan-crash-investigated/story-e6frg8yo-1226159681671.  The cause of the crash may never be known because the flight recorders were destroyed by a missile soon after the accident. http://www.dailytelegraph.com.au/news/cause-of-a-helicopter-crash-in-afghanistan-that-killed-army-pilot-lieutenant-marcus-case-may-never-be-known/story-e6freuy9-1226397995791

[38] http://www.washingtonpost.com/wp-dyn/content/article/2007/02/09/AR2007020901860.html

## IV.     Analysis of the Defendant's Background

The defendant began his employment at Boeing in 2006.  His employment history is summarized as follows:

October 2006 to March 2008 - Painter Aircraft A

March 2008 to Present - Composite Fabricator

This defendant, like every other defendant in this matter, signed Boeing's Code of Conduct prohibiting him from violating all applicable laws, rules and regulations for the length of his tenure with the company.  He also agreed to inform the company if he was arrested or charged with any criminal offenses.  However, it appears from his application for employment with Boeing in 2006, he lied about whether he had any prior convictions.  Specifically, in response to the question "Under your current name or any other name, have you entered a plea of guilty or no contest or otherwise been convicted of a misdemeanor or felony offense against criminal, civil or military law . . . . ?  A conviction record will not necessarily bar you from employment." The defendant answered "No."  (A copy of this application will be provided to the Court at the sentencing hearing).

The defendant also has an old but significant criminal history for narcotics and violent crime, including prior sentences to jail time and to ARD.  In addition to his convictions in 1980 and 1985 for drug crimes, his 1982 conviction for a crime of simple assault, and his 1984 conviction for theft by unlawful taking, possession of instruments of crime and criminal mischief, all described above, the defendant was arrested in 1985 for being a fugitive and in 1988 for possession of controlled substances.  Clearly his arrest in this case did not have a deterrent effect on his criminal conduct, as the defendant repeatedly violated his bail conditions by committing additional crimes.  In light of all of these events, the nature and circumstances of

17

the offenses committed and the history and characteristics of the defendant counsel in favor of a sentence at or near the top of the guideline range.

### B.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

The sentence imposed in this case must fairly punish the defendant for his criminal conduct, and reflect the seriousness of the offense.  Of the Boeing defendants charged with misdemeanors, this defendant is one of the few that has a significant criminal history and was found to have violated his conditions of release by continued criminal conduct.  The government respectfully submits that to sentence this defendant to anything other than at or near the top of the sentencing guideline range would not reflect the seriousness of his offenses, would undercut respect for the law by those with whom he worked, and would not provide a just punishment for his offenses.

### C.   The Need to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant

When passing the Sentencing Reform Act, Congress explained:

[It is our] view that in the past there have been many cases, particularly in instances of major white collar crime, in which probation has been granted because the offender required little or nothing in the way of institutionalized rehabilitative measures . . . and because society required no insulation from the offender, without due consideration being given to the fact that the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance. The placing on probation of [a criminal] may be perfectly appropriate in cases in which, under all the circumstances, only the rehabilitative needs of the offender are pertinent; such a sentence may be grossly inappropriate, however, in cases in which the circumstances mandate the sentence's carrying substantial deterrent or punitive impact.

S. Rep. No. 98-225, at 91-92 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3274-75.

Prescription drug abuse is a "significant threat" in the United States.[39]  The investigation here took a large amount of government resources and, because of the nature of the plant under investigation and the closed culture of its employees, took many years.  The recommended sentence of incarceration affords adequate deterrence to others who would commit a similar offense. The general deterrent effect of a prison sentence is an appropriate consideration in choosing a reasonable sentence.  As the courts of appeals have held both before and after Booker, deterrence under Section 3553(a) is not limited to deterrence of the particular defendant. See, e.g., United States v. Eura, 440 F.3d 625, 638 (4th Cir. 2006) (concurring opinion) (referring to the court's consideration of "the general deterrence factor, § 3553(a)(2)(B)"); United States v. Jordan, 435 F.3d 693, 698 (7th Cir. 2006) (describing how Section 3553(a) "specifies that the court may consider the need for general deterrence and respect for the law"); United States v. Glover, 431 F.3d 744, 751 (11th Cir. 2005) (noting that pre-Booker and post-Booker, "the underlying goals of the statute and the Guidelines are retribution, general deterrence, incapacitation, and rehabilitation" (internal quotation marks omitted)); see also United States v. Yeaman, 248 F.3d 223, 232 (3d Cir. 2001) (referring to Section 3553(a)'s goals of "general deterrence, specific deterrence, retribution, and rehabilitation").  In this case, it is clear that there is also a specific need to protect the public from further crimes of the defendant, for at least as long as he remains incarcerated. Accordingly, a sentence at or near the top of the sentencing guidelines would help accomplish both the general and specific deterrence goals of the Sentencing Guidelines.

---

[39]     National Drug Intelligence Center, National Drug Threat Assessment 2005, U.S. Department of Justice, Document ID: 2005-Q0317-003, February 2005 at 99.

**D.** **The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

In this case, in light of the defendant's need for substance abuse treatment, the government requests that the Court "provide the defendant with needed . . . medical care," or other care, and incorporate such care into a sentence of imprisonment and supervised release. Section 3553(a)(2)(D).

**E.** **The Guidelines and Policy Statements Issued by the Sentencing Commission**

As stated earlier, the Guidelines retain their significant importance in advising judges about appropriate sentences. Uniformity in sentencing should be a paramount goal; in order to rid the criminal justice system of unpredictability and possible bias, like offenders should receive like sentences, to the extent possible. The only vehicle for achieving such a goal is through the application of the Sentencing Guidelines. Here, the defendant's conduct warrants a guideline sentence and, the government submits, a sentence at or near the top of the guideline range.

**F.** **The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

A guidelines sentence is necessary when considering the importance of avoiding unwarranted sentencing disparities, another factor that is set forth in Section 3553(a). As an initial matter, this Section 3553(a) factor is not primarily concerned with sentencing disparities in a particular case; it is designed to ensure sentencing consistency among similarly situated defendants across the entire nation. See United States v. Parker, 462 F.3d 273 (3d Cir. 2006); United States v. Carson, 560 F.3d 566, 586 (6th Cir. 2009) ("Although it is true that § 3553(a)(6) requires a sentencing judge to consider 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct,'" that

"factor 'concerns national disparities between defendants with similar criminal histories convicted of similar criminal conduct – not disparities between co-defendants.'").

       **G.**    **The Need to Provide Restitution to Any Victims of the Offense**

       Restitution is not an issue in this case.

**IV.**    **CONCLUSION**

       For all of the reasons stated above, the government respectfully recommends a sentence at or near the top of the sentencing guidelines range of zero to six months imprisonment.

                        Respectfully submitted,
                        ZANE DAVID MEMEGER
                        United States Attorney

                        _____/s/_____
                        FAITHE MOORE TAYLOR
                        ASHLEY K. LUNKENHEIMER
                        Assistant United States Attorneys

**<u>CERTIFICATE OF SERVICE</u>**

I certify that a copy of the GOVERNMENT'S SENTENCING MEMORANDUM

has been filed electronically on the Electronic Case Filing d system and is available for viewing

and downloading from the ECF system, and/or was served by electronic mail on the following

defense counsel:

James Lammendola, Esq.
Counsel for Vincent Joseph Demsky

_____/s/_____
Ashley K. Lunkenheimer
Assistant U.S. Attorney

Date:  October 31, 2012